# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60443

United States Court of Appeals
Fifth Circuit

**FILED**
December 29, 2016

Lyle W. Cayce
Clerk

DELEK REFINING, LIMITED,

>     Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION;
THOMAS E. PEREZ, SECRETARY, DEPARTMENT OF LABOR,

>     Respondents.

On Petition for Review of an Order of the
Occupational Safety and Health Review Commission

Before DENNIS, ELROD, and GRAVES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Delek Refining, Limited purchased an oil refinery in Tyler, Texas from Crown Central. After the transfer in ownership, the Occupational Safety and Health Administration conducted an inspection and issued a citation for violations of its process safety management rules, which govern an employer's responsibility to inspect, and to develop inspection and recording regimes for, machinery that handles large volumes of hazardous chemicals. Because we conclude that the citations for Items 4 and 12 are barred by the six-month statute of limitations in 29 U.S.C. § 658(c), we VACATE the citations for those items. Because we also conclude that the regulations relevant to the citation

No. 15-60443

for Item 8 are ambiguous and the Secretary's interpretation is reasonable, we AFFIRM the citation for Item 8.

## I.

Delek purchased an oil refinery located in Tyler, Texas from Crown Central and took possession on April 29, 2005. Beginning in February 2008, the Occupational Safety and Health Administration conducted a four-month inspection of the refinery and issued a citation on August 18, 2008, finding violations of 29 C.F.R. § 1910.119—an OSHA regulation governing "Process Safety Management of Highly Hazardous Chemicals"—and other regulations that are not at issue here. Section 1910.119 imposes a series of requirements on employers which are intended, according to that section's purpose statement, to "prevent[ ] or minimiz[e] the consequences of catastrophic releases of toxic, reactive, flammable, or explosive chemicals . . . [that] may result in toxic, fire or explosion hazards." *Id.*

Delek petitions for review of citation Items 4, 8, and 12. Item 4 alleges a failure to resolve open findings and recommendations identified during process hazard analyses that occurred in 1994, 1998, 1999, 2004, and 2005—prior to Delek purchasing and taking possession of the refinery.[1] Item 8 alleges an

---

[1] The regulations underlying the citation for Item 4 provide:

(5) The employer shall establish a system to promptly address the team's findings and recommendations; assure that the recommendations are resolved in a timely manner and that the resolution is documented; document what actions are to be taken; complete actions as soon as possible; develop a written schedule of when these actions are to be completed; communicate the actions to operating, maintenance and other employees whose work assignments are in the process and who may be affected by the recommendations or actions.
(6) At least every five (5) years after the completion of the initial process hazard analysis, the process hazard analysis shall be updated and revalidated by a team meeting the requirements in paragraph (e)(4) of this section, to assure that the process hazard analysis is consistent with the current process.
(7) Employers shall retain process hazards analyses and updates or revalidations for each process covered by this section, as well as the

No. 15-60443

inadequate monitoring and inspection regime for certain equipment involved in process safety management.[2] Specifically, the Secretary alleges that Delek failed to inspect a positive pressurization unit, which pressurizes the control room for the fluid catalytic cracking unit and detects the presence of hazardous vapors. Item 12 alleges that Delek failed to determine and document a response to the findings of a 2005 compliance audit in a timely manner.[3] As with Item 4, the audit at issue in Item 12 was conducted before Delek took possession of the refinery.

The Secretary of Labor brought an enforcement action against Delek for these and other violations. The administrative law judge affirmed seven of the

---

documented resolution of recommendations described in paragraph (e)(5) of this section for the life of the process.
29 C.F.R. § 1910.119(e)(5)–(7).

[2] The regulations underlying the citation for Item 8 provide:

(1) Application. Paragraphs (j)(2) through (j)(6) of this section apply to the following process equipment: (i) Pressure vessels and storage tanks; (ii) Piping systems (including piping components such as valves); (iii) Relief and vent systems and devices; (iv) Emergency shutdown systems; (v) Controls (including monitoring devices and sensors, alarms, and interlocks) and, (vi) Pumps. . . .
(4) Inspection and testing. (i) Inspections and tests shall be performed on process equipment.
29 C.F.R. § 1910.119(j)(1), (4).

[3] The regulations underlying the citation for Item 12 provide:

(1) Employers shall certify that they have evaluated compliance with the provisions of this section at least every three years to verify that the procedures and practices developed under the standard are adequate and are being followed.
(2) The compliance audit shall be conducted by at least one person knowledgeable in the process.
(3) A report of the findings of the audit shall be developed.
(4) The employer shall promptly determine and document an appropriate response to each of the findings of the compliance audit, and document that deficiencies have been corrected.
(5) Employers shall retain the two (2) most recent compliance audit reports.
29 C.F.R. § 1910.119(o).

violations with penalties totaling $32,850. *Secretary of Labor v. Delek*, 2011 WL 12709990 (OSHA Apr. 27, 2011) (*Delek I*).[4] Delek appealed six of the seven violations to the Occupational Safety and Health Review Commission (OSHRC or Commission).[5] The Commission unanimously vacated two violations and upheld a third. *Secretary of Labor v. Delek*, 2015 WL 1957889 (OSHRC Apr. 23, 2015) (*Delek II*). In a 2-1 split decision, the Commission also upheld the three remaining violations; Commissioner MacDougall dissented from the Commission's decision affirming these three violations. *Id.* at \*16–27. The final three violations, each carrying a penalty of $6,300, are the subject of this appeal.

## II.

We review the Commission's factual findings to determine whether they are supported by substantial evidence in the record considered as a whole. *MICA Corp. v. OSHRC*, 295 F.3d 447, 449 (5th Cir. 2002). We review the Commission's legal conclusions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Trinity Marine Nashville, Inc. v. OSHRC*, 275 F.3d 423, 427 (5th Cir. 2001); 5 U.S.C. § 706(2)(A).

We will defer to the agency's interpretation of its own organic statute only if the text is ambiguous and the agency's interpretation is reasonable. *Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984);

---

[4] Though the ALJ affirmed the citation for Item 4, it did so only after deleting the allegations related "to the PHA team's findings and recommendations from 1998 and 2005." *Delek I*, 2011 WL 12709990, at \*33.

[5] The Occupational Safety and Health Act divides administrative actions between the Secretary of Labor and the Occupational Safety and Health Review Commission. The Secretary has the responsibility of promulgating standards through rulemaking and bringing enforcement actions against employers. The Commission adjudicates appeals after an initial hearing before an administrative law judge. *Martin v. OSHRC*, 499 U.S. 144, 147–48 (1991).

No. 15-60443

*Lari v. Holder*, 697 F.3d 273, 278 (5th Cir. 2012). We will consider all the "traditional tools of statutory construction" before concluding that a statute is ambiguous. *Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015). If we determine that the text is clear, we owe no deference to the agency's interpretation. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013) ("Where Congress has established a clear line, the agency cannot go beyond it[.]"); *Lari*, 697 F.3d at 278. If, however, we determine that the text is ambiguous, we will defer to the agency's reasonable interpretation. *Lari*, 697 F.3d at 278. Likewise, we will defer to an agency's reasonable interpretation of its own regulations when the text of the regulation is ambiguous. *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000). "In situations in which the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable," and it "sensibly conforms to the purpose and wording of the regulations." *Martin*, 499 U.S. at 150–51 (alterations omitted). If the regulation is clear, we will not defer. *Christensen*, 529 U.S. at 588; *see also Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 495–96 (5th Cir. 2003).

## III.

### A.

We first consider Delek's challenge to the citations for Items 4 and 12. Items 4 and 12 relate to the process hazard analysis (PHA) and compliance audits required by Section 1910.119. That provision requires an employer to update and revalidate a PHA every five years. 29 C.F.R. § 1910.119(e)(6). A PHA requires the full-time labor of five to twelve skilled engineers and managers and generally takes four to six weeks. A PHA must "identify, evaluate, and control the hazards involved in the process." 29 C.F.R. § 1910.119(e)(1). After a PHA is completed, the employer must, *inter alia*, "establish a system to promptly address" its findings, assure their timely

resolution, and document the manner in which they were resolved. *Id.* § 1910.119(e)(5). Similarly, Section 1910.119 requires an employer to complete a compliance audit at least every three years. *Id.* § 1910.119(o)(1). The compliance audit "verif[ies] that the procedures and practices developed under the standard are adequate and are being followed." *Id.* A compliance audit requires the efforts of eight to ten skilled employees and can take up to a week to perform. An employer must create a report after the audit and "promptly determine and document an appropriate response to each of the findings of the compliance audit, and document that deficiencies have been corrected." *Id.* § 1910.119(o)(3), (4). The employer must retain the records from its two most recent compliance audits. *Id.* § 1910.119(o)(5).

Delek argues that the citations for Items 4 and 12 are barred by the statute of limitations in 29 U.S.C. § 658(c). That section provides that "[n]o citation may be issued under this section after the expiration of six months following the occurrence of any violation." 29 U.S.C. § 658(c). According to Delek, because the PHAs and the audit at the root of Items 4 and 12 took place in 1994, 1998, 1999, 2004, and 2005, the Secretary's 2008 citations are outside the six-month statute of limitations.[6]

---

[6] Delek also argues that the citations for Items 4 and 12 must be vacated because the violations underlying those Items were committed by Crown Central. According to Delek, Section 1910.119 does not authorize successor liability. Delek further argues that, even if Section 1910.119 does impose successor liability, the citations for Items 4 and 12 must still be vacated because the Commission did not undertake a successor liability analysis. By contrast, the Secretary contends that the successor liability doctrine is not implicated because Delek was cited for its own failure to resolve open PHA and audit findings after it purchased the plant from Crown Central. The Secretary also argues that Section 1910.119's mandate is focused on the "process," rather than a particular employer, and so Section 1910.119's requirements survive a change of ownership. Finally, the Secretary contends that Section 1910.119 is ambiguous and can reasonably be read to authorize successor liability. Because we vacate the citations for Items 4 and 12 based on Section 658(c)'s statute of limitations, we do not reach the successor liability issue.

No. 15-60443

Delek relies heavily on a decision by one of our sister circuits—*AKM LLC dba Volks Constructors v. Secretary of Labor*, 675 F.3d 752 (D.C. Cir. 2012)—to support its statute of limitations argument. That case involved a set of citations issued by OSHA for violations of rules created under 29 U.S.C. § 657(c). *Id.* at 755. Those rules required employers to "make, keep, and preserve" records of workplace injuries within a designated timeframe. 29 U.S.C. § 657(c)(1). Volks was cited in November 2006 for its failure to create and maintain such records between 2002 and early 2006. *Volks*, 675 F.3d at 753. The company argued that Section 658(c)'s six-month limitations period began to run when the violation occurred (*i.e.*, when the prescribed deadline for creating the records had run) and that the citations were issued more than six months after this time. *Id.* at 753. The Secretary, by contrast, argued that Volks' failure to create the required records was a *continuing* violation of the regulations, such that the six-month period began anew each day until the close of the five-year period for which employers are required to keep records. *Id.* at 755.

The D.C. Circuit rejected the Secretary's continuing violations theory. *Id.* at 755–59. In particular, the court concluded that such a theory was inconsistent with the text of Section 658(c), which identifies an "occurrence" as the trigger for the statute of limitations. *Id.* at 755–56. According to the court, an "occurrence" "clearly refers to a discrete antecedent event—something that 'happened' or 'came to pass' 'in the past.'" *Id.* at 755 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–10 & n.5 (2002)). The Secretary's continuing violations argument was inconsistent with this understanding of an "occurrence" because the nature of a continuing violation is that it is ongoing—not a discrete, past event. *Id.*

7

No. 15-60443

Though we are not bound by the *Volks* decision, we find its reasoning persuasive.[7] Section 1910.119 requires an employer to "establish a system to promptly address the [PHA] team's findings and recommendations," to "assure that the recommendations are resolved in a timely manner," and to "promptly determine and document an appropriate response to each of the findings of the compliance audit . . . ." 29 C.F.R. § 1910.119(e)(5), (o)(4). Just as a single violation "occurr[ed]" in *Volks* when the company failed to create the records within the prescribed time-period, so too a violation of subsections (e)(5) and (o)(4) "occur[s]" within the meaning of Section 658(c) when an employer does not "promptly" or "timely" do as Section 1910.119 directs.[8]

The Secretary reasserts here the "continuing violations" theory made in *Volks*, arguing that Delek's failure to address the findings or recommendations at issue in Items 4 and 12 is a "continuing violation" and so Section 658(c)'s statute of limitations never began to run on those citations because they were never abated. We cannot accept this argument. To begin with, we note that applying a continuing violations theory in this case would conflict with the basic purposes of a statutory limitations period. "The general working presumption in federal civil and criminal cases is that a federal civil cause of action or criminal offense must have some statute of limitations and must not

---

[7] The Secretary argues that *Volks* only purported to apply to violations of record-making regulations promulgated under 29 C.F.R. Part 1904. This reading is implausible. While *Volks* certainly involved a violation of a record-making regulation, nothing in the majority opinion purports to limit its reach to Part 1904 record-making regulations.

[8] The Secretary has, on at least one occasion, taken the position that a response to PHA and audit recommendations is "timely" when it is done within "one to two years." *See Secretary of Labor v. BP Prods. N. Am., Inc.*, 2013 WL 9850777, at *37 (OSHRC Aug. 12, 2013). We need not address this issue here, however, because the Secretary has not argued that the citations underlying Items 4 and 12 would be timely under the interpretation of Section 658(c) we now adopt, even if Section 1910.119's references to "timely" or "prompt" action afforded an employer more than one or two years to resolve open PHA or audit recommendations.

allow suits to be brought forever and ever after the acts in question." *PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 50 (D.C. Cir. 2016); *id.* ("As Chief Justice Marshall stated, allowing parties to sue 'at any distance of time' would be 'utterly repugnant to the genius of our laws. In a country where not even treason can be prosecuted after a lapse of three years, it could scarcely be supposed that an individual would remain forever liable to a pecuniary forfeiture.'" (quoting *Adams v. Woods*, 6 U.S. 336, 342 (1805))). The purpose of a statute of limitations is to "provide 'security and stability to human affairs,'" *Gabelli v. SEC*, 133 S. Ct. 1216, 1221 (2013) (quoting *Wood v. Carpenter*, 101 U.S. 135, 139 (1879)), by promoting the "elimination of stale claims, and [promoting] certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Gabelli*, 133 S. Ct. at 1221 (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)).

The Secretary's proposed reading of Section 658(c) is, at best, in tension with these policies. Under the Secretary's theory, OSHA would have authority to penalize an employer for failing to "promptly" or "timely" address PHA or audit recommendations or findings that arose twenty or more years prior—which is exactly what would occur in this case were we to accept the Secretary's position. And as the Secretary has candidly acknowledged, his interpretation would authorize citations for unaddressed PHA or audit recommendations *ad infinitum*.

At the same time, the Secretary's reading of Section 658(c)—one that allows for citations decades after the "occurrence" of a violation—is at odds with the six-month limitations period in Section 658(c)'s text. Accepting the Secretary's reading would effectively nullify the six-month limitations period that Congress deliberately wrote into Section 658(c) and thereby render that language meaningless in many cases. Our precedents, however, have repeatedly cautioned against interpreting statutes in such a manner if at all

possible. *See, e.g.*, *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) ("[W]ords in statutes should not be discarded as 'meaningless' and 'surplusage' when Congress specifically and expressly included them . . . ."); *accord Volks*, 675 F.3d at 756 ("[W]e must be 'hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.'" (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011))).

It is true that *Volks* left open the possibility that Section 658(c)'s statute of limitations "could be extended by the continuing violations concept" and identified safety violations as a possible candidate for the continuing violations theory. *Volks*, 675 F.3d at 758 ("Of course, where, for example a company continues to subject its employees to unsafe machines, or continues to send its employees into dangerous situations without appropriate training, OSHA may be able to toll the statute of limitations on a continuing violations theory since the dangers created by the violations persist." (internal citations omitted)). The Secretary argues strenuously that the continuing violations theory applies to the directives in subsections (e)(5) and (o)(4).

We, like the *Volks* court, do not decide whether OSHA may be able to use the continuing violations theory to toll Section 658(c)'s statute of limitations in cases involving continuing, unlawful risks to employee health and safety. Here, neither Section 1910.119(e)(5) nor (o)(4) mandates that the employer *actually remedy* the issues addressed in a PHA or audit recommendation. *See* 29 C.F.R. § 1910.119(e)(5), (o)(4). Subsection (e)(5) directs the employer to "address" the findings from a PHA and to "resolve[ ]" them in a timely manner. Likewise, subsection (o)(4) directs employers to "determine and document an appropriate response" to the audit compliance findings. As the Secretary acknowledges in his brief, "[a] PHA finding or recommendation is 'resolved' when the employer has adopted the item *or has justifiably declined to do so*." Secretary Br. at 5 n.2

(emphasis added); *see also id.* at 34 ("Delek might have evaluated the findings and determined that they were not valid . . . ."); *id.* at 41–42 ("OSHA compliance guidance provides that *an employer may justifiably decline to adopt a PHA finding or recommendation.* Similarly, the cited audit report provision, 29 C.F.R. § 1910.119(o)(4), says that the employer may determine an *appropriate* response to each audit finding. Thus, *employers have discretion to reject items that they consider unmerited.*" (citation omitted) (second emphasis in original)). And at oral argument, the Secretary acknowledged that "under the cited standards, the employer *has the option of deciding that no resolution is necessary.*" Oral Argument at 20:52–60, *Delek Refining Ltd. v. OSHRC*, No. 15-60443 (emphasis added); *id.* at 35:27–38 ("The provision gives the employer the option of deciding once . . . audit or PHA findings and recommendations are made of saying, 'Well, we don't have to do anything further.'").[9]

In other words, while a PHA or audit might result in a recommendation—even a safety-related recommendation—an employer is under no obligation to actually implement that recommendation. This structure is quite unlike a safety regulation which commands the employer to actually remedy a safety hazard and maintain a workplace free of such hazards, and it distinguishes subsections (e)(5) and (o)(4) from the type of safety-related regulation for which a continuing violations theory might be appropriate. Accordingly, we cannot agree with the Secretary that the continuing violations theory applies here.[10]

---

[9] In the ALJ's opinion, each of the "open" items related to Item 4 are described as "recommendation[s]." *Delek I*, 2011 WL 12709990, at \*4–5.

[10] We emphasize that in rejecting this argument, we, like the D.C. Circuit, "express no opinion on whether some other violations, if any, could, for some other reason, be extended by the continuing violations concept." *Volks*, 675 F.3d at 758. We conclude only that, in light of the text of Section 658(c) as applied to the relevant portions of Section 1910.119(e) and (o), the continuing violations theory is not applicable.

No. 15-60443

We conclude, as did the D.C. Circuit, that Section 658(c) is clear, and so we do not defer to the Secretary's interpretation. *See Volks*, 675 F.3d at 755, 759. Accordingly, we hold that Section 658(c)'s six-month statute of limitations bars the citations for Items 4 and 12. We therefore vacate those citations.

## B.

The Secretary also cited Delek under Item 8 for failing to inspect a piece of equipment known as the positive pressurization unit (PPU). Delek contends that this citation is unlawful because the PPU is not encompassed by the relevant regulations. Because this dispute involves the interpretation of a binding regulation promulgated by the agency, we defer to the agency's interpretation if the text is ambiguous and the agency's interpretation is reasonable. *Christensen*, 529 U.S. at 588. Because we conclude that the relevant portions of Section 1910.119 are ambiguous and the Secretary's interpretation is reasonable, we AFFIRM the citation for Item 8.

Delek's refinery contains a fluid catalytic cracking unit (FCCU). The process of fluid catalytic cracking involves "converting crude oil into usable fuels, such as gasoline, by a process that could release hazardous vapors." *Delek II*, 2015 WL 1957889, at *7. This process is managed by Delek employees from the FCCU control room. *Id*. The PPU is located in the FCCU control room, and "consists of an intake stack that draws in outside air and a fan that pulls the air into the control room." *Delek I*, 2011 WL 12709990, at *10. In so doing, the PPU maintains "positive pressure" inside the FCCU control room, thereby

---

Nor does our decision cast doubt upon the application of the discovery rule to Section 658(c). *See, e.g., Austin Indus. Specialty Servs., L.P. v. OSHRC*, 765 F.3d 434, 442 (5th Cir. 2014). The rule states that "OSHA may cite a party for an uncorrected violation of applicable regulations within six months from the time that OSHA discovers, or should have discovered, the facts establishing the violation." *Id*. at 442. The Secretary here did not raise the discovery rule to justify the timing of the citations underlying Items 4 and 12.

No. 15-60443

"keep[ing] harmful or hazardous vapors from entering the control room."[11] *Id.* at *9, *10 (quotation marks omitted). Without the PPU, hazardous vapors could enter the FCCU control room and harm Delek employees managing the fluid catalytic cracking process or react with wiring in the control room to cause a catastrophic explosion. *Delek II*, 2015 WL 1957889, at *7; *Delek I*, 2011 WL 12709990, at *15. The PPU also contains two sensors. One detects whether the FCCU control room is pressurized and triggers an alarm that indicates when it is not. *Delek I*, 2011 WL 12709990, at *10; *Delek II*, 2015 WL 1957889, at *7. The other detects the presence of combustible gas and will shut down the intake stack to prevent the gas from entering the control room if such gas is detected.[12] *Id.*

The parties do not dispute where the PPU is located, what it consists of, or what it does. They instead dispute whether the PPU is subject to the inspection requirements of 29 C.F.R. § 1910.119(j). Section 1910.119 applies to "a process which involves a Category 1 flammable gas" and further defines "process" as "any activity involving a highly hazardous chemical including any use, storage, manufacturing, handling, or the on-site movement of such chemicals, or combination of these activities." 29 C.F.R. § 1910.119(a)(1)(ii), (b). Section 1910.119(j) requires employers to "establish and implement written procedures to maintain the on-going integrity of process equipment" and to perform "[i]nspections and tests . . . on process equipment." *Id.* § 1910.119(j)(2), (4)(i). Section 1910.119(j), in turn, defines "process equipment" as "the following": "(i) Pressure vessels and storage tanks; (ii) Piping systems (including piping components such as valves); (iii) Relief and

---

[11] Delek's own "Mechanical Integrity Manual" describes the purpose of "control room pressurization" as "keeping harmful or hazardous vapors from entering."

[12] As the ALJ noted, several Delek employees testified that the PPU serves an important safety function. *See Delek I,* 2011 WL 12709990, at *11, *13.

vent systems and devices; (iv) Emergency shutdown systems; (v) Controls (including monitoring devices and sensors, alarms, and interlocks) and, (vi) Pumps." *Id.* § 1910.119(j)(1)(i)–(vi).

The Secretary argues that the PPU is subject to Section 1910.119(j)'s inspection regime because: (1) the PPU is an integral part of the FCCU, which is a "process" under Section 1910.119(b); and (2) the PPU is "process equipment" under Section 1910.119(j). We will address these issues in turn.

### 1.

The Commission concluded that the PPU fits within Section 1910.119(b)'s definition of "process" because "the PPU is an integral part of the overall [FCCU] 'process.'" *Delek II*, 2015 WL 1957889, at *7. On appeal, the Secretary urges us to accept this determination. While both parties agree that the FCCU is a "process" within the meaning of Section 1910.119(b), they dispute whether the PPU is a part of the FCCU process.

We conclude, based on the undisputed facts as to the PPU's function, that the Commission reasonably determined that the PPU is part of the overall FCCU "process" and is therefore covered by Section 1910.119(b). As the Commission indicated, the PPU serves an important function vis-à-vis the fluid catalytic cracking process by ensuring maintenance of positive air pressure within the FCCU control room and thereby preventing the flow of hazardous chemicals or vapors into the control room. In so doing, the PPU protects the Delek employees within the FCCU control room who are managing the fluid catalytic cracking process, and, in turn, plays a role in protecting the integrity of that process. Further, by preventing the flow of hazardous chemicals into the FCCU, the PPU prevents hazardous vapors from interacting with the wiring in the FCCU and potentially causing an explosion. In short, the PPU does far more than serve as a mere ventilation system; it plays an

important part in ensuring the integrity of the fluid catalytic cracking process itself.

Delek argues, however, that the PPU cannot be part of a "process" because it does not fit within the definition of "process" in 29 C.F.R. § 1910.119(b). Specifically, Delek contends in its briefing that the activities listed in the definition of process—"use, storage, manufacturing, handling, or [ ] on-site movement"—show that a "process" is limited to the "containment of the highly hazardous chemical and the actual manufacturing of a product." As Delek correctly notes, the PPU does not contain any highly hazardous chemicals, nor does it use, store, manufacture or handle such chemicals—at least not in the ordinary sense of those terms. *Cf.* 29 C.F.R. § 1910.119(b).

However, the Commission did not conclude—and the Secretary does not argue on appeal—that the PPU *itself* is a "process." As noted, the Commission concluded that "the PPU is an integral part *of the overall FCC unit 'process.'"* *Delek II*, 2015 WL 1957889, at \*7 (emphasis added). As a result, the PPU need not independently constitute a "process" under Section 1910.119(b). But in any event, to the extent Section 1910.119(b)'s definition is pertinent to defining the parameters of a covered "process," we do not agree that Section 1910.119(b)'s definition necessarily excludes the PPU. Section 1910.119(b) defines "process" broadly to encompass "*any* activity *involving* a highly hazardous chemical *including* any use, storage, manufacturing, handling, or the on-site movement of such chemicals . . . ." 29 C.F.R. § 1910.119(b) (emphasis added). It is undisputed that the PPU operates to detect the presence of highly hazardous chemicals and gases and to prevent them from entering the FCCU. In performing this "activity," the PPU undoubtedly "involv[es]" the very chemicals and gases that it detects and prevents from entering the FCCU control room.

Delek argues, however, that the PPU does not fit within any of the specific activities listed in the definition of "process"—"use, storage, manufacturing, handling, or . . . on-site movement" of such chemicals. 29 C.F.R. § 1910.119(b). But the use of the term "including" within Section 1910.119(b)'s definition indicates that these forms of "involv[ement]" with highly hazardous chemicals are not an exhaustive listing. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 132 (Thomas/West 2012) ("[T]he word *include* does not ordinarily introduce an exhaustive list . . . ."). Thus, even assuming that the PPU's involvement with highly hazardous chemicals does not fit within one of the examples listed in Section 1910.119(b), that fact would not clearly exclude the PPU from the definition of "process" in Section 1910.119(b).

Delek further argues that the PPU "is simply too far removed from the [FCCU] to be considered part of the PSM-covered 'process' . . . ." For this argument, Delek relies on two interpretive letters from OSHA, one from January 2008 and the other from February 1997. *See* OSHA Std. Interp. 1910.119 (D.O.L.), 2008 WL 2565070 (Jan. 31, 2008) (2008 OSHA Letter); OSHA Std. Interp. 1910.119 (D.O.L.), 1997 WL 33798325 (Feb. 28, 1997) (1997 OSHA Letter). According to Delek, these letters indicate that equipment is part of a "process" only "if that system has a 'direct involvement in the overall functioning of the process' and 'can affect or cause a release.'"

The 2008 OSHA Letter, however, makes it clear that utility systems (the type of equipment at issue in that letter) are within the "scope . . . of the PSM standard" if they are "use[d] . . . *to control/prevent and mitigate* catastrophic releases of [highly hazardous chemicals]." 2008 OSHA Letter, 2008 WL 2565070, at *3 (emphasis added). As indicated, the PPU plays a role in mitigating the release of highly hazardous chemicals by preventing their

movement into the FCCU control room.[13] Likewise, the 1997 OSHA Letter indicates that a "process" encompasses equipment, even though that equipment does not contain highly hazardous chemicals, if it "could . . . interfere with mitigating the consequences of such a release." *See* 1997 OSHA Letter, 1997 WL 33798325, at \*1. This statement, however, is broader than Delek's claim that equipment may be part of a "process" only if it has "a 'direct involvement in the overall functioning of the process' and 'can affect or cause a release.'" Thus, we do not believe either of the prior OSHA Letters limited the scope of a "process" in the manner that Delek asserts, or necessarily forecloses the Secretary's interpretation here.[14]

Accordingly, we conclude that the Secretary reasonably interpreted Section 1910.119(b) in determining that the PPU is part of a "process."

**2.**

The Secretary further contends that the PPU is "process equipment" subject to Section 1910.119(j)'s inspection regime. As noted, Section 1910.119(j) supplies an exhaustive list of categories that constitute "process equipment": "(i) Pressure vessels and storage tanks; (ii) Piping systems (including piping components such as valves); (iii) Relief and vent systems and devices; (iv) Emergency shutdown systems; (v) Controls (including monitoring devices and sensors, alarms, and interlocks) and, (vi) Pumps." 29 C.F.R. § 1910.119(j)(1)(i)–

---

[13] The Commission likewise considered the 2008 OSHA Letter in the context of Delek's argument that equipment can only be part of a "process" if it contains highly hazardous chemicals. *See Delek II*, 2015 WL 1957889, at \*8.

[14] Delek also seems to argue that there was no real concern that vapors would enter the FCCU. However, Delek concedes that the PPU exists to detect the presence of combustible gases and to prevent their entrance into the FCCU.

(vi). The Secretary argues—as the Commission determined—that the PPU is a "control" because it contains "sensors" and "alarms."[15]

We agree. To begin with, we do not believe the term "control" in Section 1910.119(j) clearly excludes the PPU. That term is not elsewhere defined in Section 1910.119, and the regulation provides a non-exhaustive list of items that qualify as controls. *See* 29 C.F.R. § 1910.119(j)(1)(v) ("Controls (*including* monitoring devices and sensors, alarms, and interlocks") (emphasis added)); *see* SCALIA & GARNER, *supra*, at 132 ("[T]he word *include* does not ordinarily introduce an exhaustive list . . . ."). We therefore find that there is sufficient ambiguity in the text of Section 1910.119(j) to accord deference to the Secretary's interpretation of "control" if it is reasonable.

We conclude that it is. Section 1910.119(j) lists "sensors" and "alarms" as examples of "controls." *See* 29 C.F.R. § 1910.119(j)(1)(v). As noted, the PPU contains two sensors. The first sensor measures whether the FCCU control room has positive pressure, and this sensor is connected to, and triggers, an alarm when the control room is not fully pressurized. The second sensor detects

---

[15] The Commission also concluded that the PPU was a "control" because it "is an integral part of the FCC unit control room." *Delek II*, 2015 WL 1957889, at *8. Because we conclude, based on Section 1910.119(j)'s text, that the Secretary reasonably determined that the PPU is process equipment, we need not reach this other ground.

The Secretary also argues that the PPU is process equipment because Delek "deemed" it to be so. Again, because we conclude that the PPU is process equipment based on the text of Section 1910.119(j), we do not decide this issue. We note, however, that it is unlikely we would accept this argument if we did consider it. The Secretary relies on a portion of OSHA's summary and explanation of Section 1910.119(j), which states that "if an employer deems additional equipment to be critical to a particular process, that employer should consider that equipment to be covered by [Section 1910.119(j)] and treat it accordingly." OSHA, *Process Safety Management of Highly Hazardous Chemicals; Explosives and Blasting Agents*, 57 Fed. Reg. 6356-01, 1992 WL 30969, at *6389 (Feb. 24, 1992). But the Secretary does not direct us to any language in the text of Section 1910.119 itself to suggest that OSHA may cite an employer for failing to inspect equipment not covered by subsection (j) just because the employer believed that equipment should be covered by subsection (j). To the contrary, subsection (j)'s text indicates that its list of process equipment is exhaustive. *See* 29 C.F.R. § 1910.119(j)(1) ("Paragraphs (j)(2) through (j)(6) of this section apply *to the following process equipment* . . . ." (emphasis added)).

the presence of combustible gas and shuts down the PPU intake stack when combustible gas is detected. *Delek II*, 2015 WL 1957889, at \*7; *Delek I*, 2011 WL 12709990, at \*10. Thus, because the PPU contains multiple sensors and an alarm that are critical to its function of ensuring that combustible vapors do not enter the FCCU control room, we conclude that the Secretary reasonably concluded that the PPU is a "control" within the meaning of Section 1910.119(j).[16]

Delek raises several objections in its briefs to reading "control" to encompass the PPU. First, Delek argues that the PPU cannot constitute a "control" because Section 1910.119 is concerned with "containment of chemicals *before* release," while the PPU "merely interrupts the spread of [hazardous] chemicals from one room to the next after the release has already occurred." Delek's description of the Process Safety Management Standard, however, is inconsistent with the "Purpose" statement at the beginning of Section 1910.119 itself, which indicates that these standards are designed to "prevent[] *or minimiz[e] the consequences of* catastrophic releases of toxic, reactive, flammable, or explosive chemicals." *See* 29 C.F.R. § 1910.119 (Purpose). Preventing the flow of hazardous chemicals into the FCCU control room after their release is undoubtedly a means of "minimizing the consequences" of such a release. *Id.*

Second, Delek notes that the Preamble to the Process Safety Management Standard indicates that "process equipment" must have "'a significant impact on the safety of a process that is covered by [the PSM Standard].'" According to Delek, because the FCCU's process activities could

---

[16] Because Section 1910.119(j)'s definition of control explicitly references "alarms" and "sensors" as examples of "controls," we do not agree with the *amici* that interpreting Section 1910.119(j) to encompass the PPU deprives employers of sufficient notice of the potential scope of Section 1910.119(b) and (j).

continue even if the PPU failed, it cannot be considered "process equipment." Again, we do not find this argument persuasive. The PPU does serve a safety function by preventing the flow of released hazardous chemicals into the FCCU control room. In so doing, the PPU not only protects the Delek employees within that control room, but also protects the integrity of the FCCU process itself, which is managed by those employees.[17]

Finally, Delek and the *amici* argue that interpreting "control" in Section 1910.119(j) to encompass the PPU would lead to absurd results because a door, window, wall, or anything else that "'interrupts the circulation of already-released hazardous chemicals'" would constitute "process equipment." This slippery slope argument, however, ignores the fact that the PPU's *purpose* is to prevent the flow of hazardous chemicals into the FCCU control room. While a door, window, or wall may have this effect incidentally, they are not designed for this purpose as is the PPU, nor are they equipped with sensors and alarms to detect the presence of hazardous gases and to measure whether the FCCU control room is properly pressurized. Thus, we disagree with Delek and the *amici* that upholding the Secretary's interpretation of Section 1910.119(b) and (j) sweeps equipment only tangentially related to a covered process into the definitions of "process" and "process equipment," or that it brings *non*-equipment, such as a door or window, into the ambit of those subsections.

We therefore hold that the relevant provisions of Section 1910.119 do not clearly exclude the PPU from being a part of a "process" or "process

---

[17] Delek also argues that "the Commission failed to see the distinction between independently *possessing* controls and *being* a control for a PSM-covered 'process.'" According to Delek, "[t]he fact that the PPU has sensors does not bring it within [Section 1910.119(j)(4)(i)] because the controls have nothing to do with the FCC unit." For the reasons already given, we have concluded that the PPU can reasonably be viewed as a part of the FCCU process, and so its operation as a "control" under Section 1910.119(j) is for a covered "process."

No. 15-60443

equipment." Because the Secretary's interpretation is reasonable, we defer to that interpretation.[18]

## IV.

We hold that the citations for Items 4 and 12 are barred by Section 658(c)'s six-month statute of limitations. We also hold that the Secretary reasonably determined that the PPU is covered by 29 C.F.R. § 1910.119. Accordingly, we VACATE the citations for Items 4 and 12 and AFFIRM the citation for Item 8, which amounts to $6,300.

---

[18] Delek argues vigorously that the Commission erred by declining to consider testimony of its experts as to whether the PPU was a part of "process" and constituted "process equipment," while not similarly declining to consider the testimony of the Secretary's expert on the same subject. *See Delek II*, 2015 WL 1957889, at *7 n.7. We agree with Delek that the Commission had no justifiable reason for declining to consider Delek's expert's testimony while not doing the same for the Secretary's expert's testimony. On appeal, the Secretary did not attempt to defend the Commission's action in this regard.

However, we conclude that the Commission's error was harmless, and so we do not reverse on this basis. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011) ("'In administrative law, as in federal civil and criminal litigation, there is a harmless error rule.'" (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 (2007)). Upon reviewing the Commission's decision, it is clear that the Commission based its conclusion on the text of Section 1910.119(b) and (j) and the undisputed facts regarding the PPU's function. *See Delek II*, 2015 WL 1957889, at *6–9. The Commission's decision does not appear to rely in any way on the testimony of the Secretary's expert in support of its decision to affirm the citation for Item 8, and its decision is consistent with both parties' factual descriptions of the PPU. As a consequence, we conclude that the Commission's error "'clearly had no bearing on the procedure used or the substance of decision reached,'" and so its error was harmless. *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) (quoting *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979)).