# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 19, 2023

Lyle W. Cayce
Clerk

No. 22-60399

TNT Crane & Rigging, Incorporated,

*Petitioner,*

*versus*

Occupational Safety and Health Review Commission;
Julie A. Su, *Secretary, U.S. Department of Labor,*

*Respondents.*

Petition for Review of Orders of the
Occupational Safety and Health Review Commission
Agency No. 16-1587

Before Barksdale, Southwick, and Higginson, *Circuit Judges.*
Leslie H. Southwick, *Circuit Judge*:

A company providing crane services petitioned this court to overturn final orders of the Occupational Safety and Health Review Commission. Those orders reversed decisions by an administrative law judge that were favorable to the company. The principal dispute is whether regulations applicable to the disassembly of a crane apply to the tragic accident that occurred here.

We conclude the Commission applied the proper regulations and DENY the petition for review.

No. 22-60399

## FACTUAL AND PROCEDURAL BACKGROUND

TNT Crane & Rigging, Inc. is a crane-service provider located in Houston, Texas. It was cited by the Occupational Safety and Health Review Commission ("the Commission") for the serious injury of an employee that occurred on May 15, 2016. On that day, TNT sent a two-man crew, consisting of Jeff Benson and Mark Ryan, to install antennas on a communications tower in Georgetown, Texas, using a 275-ton mobile crane. After Benson and Ryan completed the installation, the next task was to disassemble the crane and load it onto a semi-truck trailer. TNT dispatched to the worksite two additional employees, Joseph Larison and Freddie Ray, to assist with the disassembly. Benson acted as the crew's supervisor.

To prepare for the crane's disassembly, Benson created a job safety analysis. Benson and the crew discussed a plan for "breaking the crane down" and loading it onto the trailer. Ray and Larison expressed concern about Benson's proposal to disassemble the crane near an energized 14,400-volt power line but agreed to the plan based on Benson and Ryan's assurances they had assembled the crane in the same location.

The plan called, first, for Benson to lower the boom to allow Larison to remove the "block," the mechanism that allowed the crane's rigging to be attached to an item for lifting, from the "becket," a metal connection device at the end of the crane's hoist line. After the block was removed, Larison would hold the becket with his hands to keep the hoist line taut while Benson reeled in the hoist line and further lowered the boom to lay it on the bed of a trailer. Ray would drive the truck and trailer into position to receive the boom, with Ryan guiding him. Once the boom was on the bed of the trailer, the crew would continue the process by disconnecting the jib from the boom by removing metal pins.

Shortly after discussing the plan, the crew began to execute it. Larison removed the block from the becket, and Ray and Ryan began moving the truck and trailer into position. As Benson started lowering the boom and reeling in the hoist line and Larison held the becket, Larison noticed the hoist line was getting close to the power line and "gave the signal to swing right, [and] then started yelling." Moments later, the hoist line contacted the energized power line, giving Larison a severe electrical shock. Larison was hospitalized with serious injuries.

TNT reported the accident and employee hospitalization to the Occupational Safety and Health Administration ("OSHA"), which prompted an investigation. OSHA conducted an inspection and issued TNT a citation, alleging two serious violations of the Cranes and Derricks in Construction Standard under 29 C.F.R. § 1926.1407, with a proposed penalty of $24,942. Item 1 alleges TNT violated Section 1926.1407(b)(3) by exposing employees to the hazard of electrical shock by failing to use at least one of the measures required to prevent encroachment or contact with the power lines while disassembling the crane. Item 2 alleges TNT violated Section 1926.1407(d) by placing "[p]art of a crane/derrick, load line, or load (including rigging and lifting accessories), whether partially or fully assembled, . . . closer than the minimum approach distance under Table A (see 1926.1408) to a power line."

On September 14, 2018, after a two-day hearing, the administrative law judge ("ALJ") issued a decision in favor of TNT, finding the cited regulations did not apply to the work performed. The Secretary of Labor ("the Secretary") filed a Petition for Discretionary Review with the Commission. On March 27, 2020, the Commission reversed and remanded the ALJ's decision. *Sec'y of Lab. v. TNT Crane & Rigging, Inc.*, No. 16-1587, 2020 WL 1657789 (OSHRC Mar. 27, 2020). On remand, the ALJ again found in favor of TNT, holding the Secretary failed to show the crane operator's violative conduct was foreseeable. On June 2, 2022, after the Secretary filed a Petition

for Discretionary Review, the Commission again reversed the ALJ's decision. *Sec'y of Lab. v. TNT Crane & Rigging, Inc.*, No. 16-1587, 2022 WL 2102910 (OSHRC June 2, 2022).

TNT timely petitioned this court for review of the Commission's decisions.

## DISCUSSION

This court's review of the Commission's decisions under the Administrative Procedure Act is "narrow and highly deferential" to the agency. *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). Under 29 U.S.C. § 660(a), the court "must accept factual findings of the Commission if they are supported by substantial evidence on the record considered as a whole," and "if a reasonable person could have found what the [Commission] found, even if the appellate court might have reached a different conclusion." *Angel Bros. Enters. v. Walsh*, 18 F.4th 827, 830 (5th Cir. 2021) (quotation marks and citations omitted) (alteration in original). The Commission's legal conclusions must be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Angel Bros.*, 18 F.4th at 830.

The Secretary establishes a violation of an OSHA standard by demonstrating "by a preponderance of the evidence: (1) that the cited standard applies; (2) noncompliance with the cited standard; (3) access or exposure to the violative conditions; and (4) that the employer had actual or constructive knowledge of the conditions through the exercise of reasonable due diligence." *Angel Bros.*, 18 F.4th at 830 (quotation marks and citation omitted). Here, the Secretary alleges violations of 29 C.F.R. § 1926.1407(b)(3) and (d), two provisions located in a section of the construction crane standard entitled "Power line safety (up to 350 kV) — assembly and disassembly."

TNT challenges the Commission's determinations that the Secretary established the first and fourth elements, *i.e.*, that Section 1926.1407 applied and that TNT had knowledge of the violative conduct. Specifically, TNT argues the Commission abused its discretion in determining that the plain meaning of the term "disassembly" as used in Section 1926.1407 includes acts preparatory to disassembling a crane. Alternatively, TNT asserts that if the standards did apply to TNT's work at the time of the accident, the Commission erred by failing to apply the foreseeability exception to the knowledge element and by finding TNT did not prove its employee misconduct affirmative defense.

We analyze these arguments in that order.

### I.     Element 1: the standard's applicability to the cited condition

In construing a regulation, we "give effect to the natural and plain meaning of" the regulation's words. *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976). When the regulation is silent or genuinely ambiguous, we decide whether the agency's interpretation is reasonable and entitled to deference. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–18 (2019). We defer to the Secretary's reasonable interpretations of ambiguous standards. *Martin v. OSHRC (CF&I)*, 499 U.S. 144, 152, 158 (1991); *accord Delek Refining, Ltd. v. OSHRC*, 845 F.3d 170, 175 (5th Cir. 2017). Before determining whether the standard's meaning is ambiguous, we must use "all the traditional tools of construction," *i.e.*, carefully consider the standard's "text, structure, history, and purpose." *Kisor*, 139 S. Ct. at 2415 (quotation marks and citation omitted); *see also Delek*, 845 F.3d at 175.

The question here is whether Section 1926.1407's definition of "disassembly" encompasses preliminary activities such as lowering a crane's boom and retracting the hoist line for the purpose of disassembly, or, instead, encompasses only the physical disassembly itself.

### a.    Plain meaning of "disassembly"

Section 1926.1407(a) states, "[b]efore assembling or disassembling equipment, the employer must determine if any part of the equipment, load line, or load (including rigging and lifting accessories) could get, in the direction or area of assembly/disassembly, closer than 20 feet to a power line during the assembly/disassembly process." The definition section of the standard defines "Assembly/Disassembly" as

> *the assembly and/or disassembly of equipment* covered under this standard. With regard to tower cranes, "erecting and climbing" replaces the term "assembly," and "dismantling" replaces the term "disassembly." Regardless of whether the crane is initially erected to its full height or is climbed in stages, the process of increasing the height of the crane is an erection process.

§ 1926.1401 (emphasis added). The parties agree that tower cranes are not involved here.

TNT maintains the Commission abused its discretion in concluding the natural and plain meaning of "disassembly" as used in the standard encompasses activities preliminary to disassembly. TNT contends the ALJ correctly determined these provisions do not apply to the specific activity its crew was engaged in at the time of the accident — lowering the crane's boom and retracting the hoist line — because, at that point, they had not yet begun to physically disassemble equipment.

We begin our analysis with the above definition of "Assembly/Disassembly" in Section 1926.1401. TNT argues the Commission ignored the remaining part of the definition: "assembly and/or disassembly *of equipment* covered under this standard." § 1926.1401 (emphasis added). TNT asserts that, by inserting "of equipment" into the definition, "disassembly" plainly refers to the *physical* disassembly of the crane and does not encompass actions

No. 22-60399

taken during a crane's normal operations. According to TNT, the Commission's broader reading of disassembly would leave employers to speculate at what point normal operation ends and disassembly begins.

We do not agree that the Commission's interpretation necessarily leaves regulated employers to speculate. We do conclude, though, that the definition in the regulation is not particularly helpful here. We examine the text and structure of the crane standard for any clarity.

TNT argues that surrounding provisions, specifically Sections 1926.1404(h)(4) and 1926.1407(a), support its assertion that "disassembly" refers to the physical disassembly of the crane itself, because the regulations distinguish the actions needed to be taken before "disassembly."[1] Thus, TNT contends there is a clear dividing line between the actions required "before assembly/disassembly begins" and "[b]efore assembling or disassembling equipment." *See* §§ 1926.1404(h)(4), 1926.1407(a). TNT also maintains that the references to the removal of pins in Subsections 1926.1404(f) and (h) and Section 1926.1405 establish that disassembly is limited to the actual removal of the crane's components.

We see these arguments as focusing too much on isolated words and phrases. The Commission identified several provisions[2] that "read as a

---

[1] 29 C.F.R. § 1926.1404(h)(4) states, "[w]hen using an assist crane, the loads that will be imposed on the assist crane at each phase of assembly/disassembly must be verified . . . *before* assembly/disassembly begins." (emphasis added). Section 1926.1407(a) requires the employer to determine, "*[b]efore* assembling or disassembling equipment," whether any part of the crane could come within 20 feet of a power line during the assembly/disassembly process. (emphasis added).

[2] For example, the Commission cited to 29 C.F.R. § Section 1926.1407(d), which expressly applies to a fully assembled crane: "[n]o part of a crane/derrick, load line, or load . . . *whether partially or fully assembled*, is allowed closer than the minimum approach distance under Table A." *TNT Crane*, 2020 WL 1657789, at *4 (emphasis and alterations in original). The Commission also determined that various provisions discuss processes

whole establish that active removal of a crane's components is not a prereq-uisite for the cited provisions to apply." *See TNT Crane*, 2020 WL 1657789, at *4–5. Most of the assembly/disassembly requirements in other sections, *see generally* §§ 1926.1404–1407, "are phrased broadly and by their nature require actions that must be initiated as part of the assembly/disassembly process before pin or component removal even begins." *TNT Crane*, 2020 WL 1657789, at *4 (citing five examples). For instance, the Commission ex-plained that the three options listed under Section 1926.1407 for addressing power line safety in the assembly/disassembly process all involve actions that must occur *before* any actual dismantling takes place. *Id.* (citing § 1926.1407(a)(1), (b)(1)). Additionally, other provisions in Section 1926.1407 demonstrate the standard expressly applies to "fully assembled" equipment, indicating applicability is not limited to when equipment is physically dis-mantled.[3] Furthermore, other provisions in Section 1926.1407 also concern actions that occur *before* equipment is physically dismantled.[4]

---

that must take place "as part of the assembly/disassembly process before pin or component removal even begins." *Id.* (citing § 1926.1404(e), (g), (h)(1), (h)(4), (h)(12)).

[3] For example, where the power line in the work area has not been deenergized and grounded, Section 1926.1407(d) prohibits the employer from conducting any disassembly work while part of the equipment, load line, or load, "*whether partially or fully assembled*," is within the minimum clearance distance permitted for the power line's voltage level under Table A. (emphasis added). Similarly, Section 1926.1407(c) prohibits disassembly work below an energized power line and expressly applies to "partially or fully assembled" equipment.

[4] For instance, Section 1926.1407(e) requires utility owners or operators to provide power line voltage information to employers within a certain timeframe to permit the employer to use Option 3 for complying with 1926.1407(a)(1), and Section 1926.1407(g) requires the posting of electrocution warnings, both of which occur before equipment is dismantled. Section 1926.1407(f)'s requirement that employers "assume that all power lines are energized unless the utility owner/operator confirms that the power line has been and continues to be deenergized and visibly grounded" contemplates that the employer

No. 22-60399

We conclude that the standard's surrounding text and structure does not limit disassembly to physically dismantling equipment.

We also look to the preamble to the crane standard's final rule for guidance. In one part of the preamble, OSHA identifies the activity at issue here — lowering a boom to position it for dismantling — as an example of when the assembly/disassembly power line assessment requirement in Section 1926.1407(a) applies:

> For example, when disassembling a crane, the disassembly process takes place in an area that includes the area under and around the boom's path as it is lowered to the ground (in most, but not all cases, the boom is lowered to the ground for the disassembly process). Under [Section 1926.1407(a)], the employer must assess the proximity that the boom will be in to the power line in its path of travel to (and on) the ground.

Cranes and Derricks in Construction; Final Rule, 75 Fed. Reg. 47,906, 47,945–46 (Aug. 9. 2010).

The final rule preamble also explains that the prohibition against assembly/disassembly below power lines in Section 1926.1407(c) applies to a "fully assembled" crane: "*in both assembly and disassembly*, maneuvering an assembled crane out from under the power lines, or *maneuvering a crane that is about to be disassembled under them*, itself poses a high risk of [power line] contact." *Id.* at 47,949 (emphases added). Additionally, the preamble to the proposed rule explains that OSHA added the reference to "disassembly" because "[t]he employer needs to evaluate power lines with respect to . . . the direction or area of disassembly *when preparing to* disassemble the crane."

---

will adopt that assumption before any equipment is dismantled and maintain it throughout the disassembly process.

Cranes and Derricks in Construction; Proposed Rule, 73 Fed. Reg. 59,714, 59,750 (Oct. 9, 2008) (emphasis added).

The Commission correctly found that these statements support the broader interpretation of "disassembly" as a process that can begin before physical dismantling. *See TNT Crane*, 2020 WL 1657789, at *6. These provisions confirm that, when a boom is lowered to allow it to be dismantled, the action of lowering the boom is part of the disassembly process to which Section 1926.1407 applies. *See id.* Construing Section 1926.1407 as applicable to steps of a disassembly process that precede the physical dismantling of equipment, such as lowering a boom into position for dismantling, comports with OSHA's intent for Section 1926.1407 to protect employees from power lines throughout the entire disassembly phase. *See* 75 Fed. Reg. at 47,944.

TNT urges us to rely on a different statement in the final rule preamble to support its narrow interpretation of "disassembly":

> Irrespective of whether the crane is initially erected to its full height, or is "jumped" in stages, the process of increasing the height of the crane is an assembly/erection process. Sections 1926.1403 through 1924.1406 apply whenever the crane's height is modified. To ensure that this intent is reflected in the standard, OSHA has added a sentence to the definition of "assembly/disassembly" in § 1926.1401 to this effect.

*See id.* at 47,936. TNT asserts the ALJ was correct in finding that this "language focuses on the addition or removal of *structural* components, *i.e.*, pins, and provides a strong indication that mere removal of the block and lowering of the boom is insufficient for application of the cited standards." TNT contends the Commission improperly ignored this statement, which evinces that the physical process of changing the crane's height is part of its assembly/erection process.

We agree with the Commission's determination that TNT's proffered statement in the preamble is inapplicable because it "was in response to a commenter's question specific to tower cranes, which is not the type of crane at issue here." *See TNT Crane*, 2020 WL 1657789, at *7. In this statement, OSHA was responding to a comment regarding the applicability of Sections 1926.1403–1406 to the process of adding sections to a fully assembled tower crane to increase its height (referred to as "jumping" or "climbing"). *See* 75 Fed. Reg. at 47,936. OSHA therefore included language in the definition of "Assembly/Disassembly" to clarify that "jumping" is considered assembly work. *See id.*

Finally, TNT argues the Commission erroneously dismissed an unreviewed ALJ decision that discusses crane disassembly. *See Sec'y of Lab. v. Steel Constructors, Inc.*, 1980 OSHD (CCH) ¶ 24788, 1980 WL 10389 (No. 78-3839, 1980) (ALJ). In that case, the citation alleged the employer allowed an employee to disassemble an unsupported boom section of a truck crane. *Id.* at *4. The ALJ vacated the citation based in part on his finding that the disassembly of the boom section had not yet begun because the equipment necessary for its dismantling had not yet been brought to the worksite and the boom was not yet resting on the ground. *Id.* at *4–6.

The Commission correctly determined *Steel Constructors* is inapplicable because it was issued three decades before the cranes standard was promulgated, "so it did not involve the term 'disassembly' within the context of that standard or even an analogous standard." *See TNT Crane*, 2020 WL 1657789 at *7. Additionally, as the Commission noted, the facts of *Steel Constructors* are distinguishable. Unlike here, where TNT's crew gathered to disassemble a crane, set a plan for doing so, and then collectively put the plan into motion, the employer in *Steel Constructors* was still acquiring materials necessary to disassemble the equipment when a rogue employee began

removing pins from a boom on his own initiative. *See Steel Constructors*, 1980 WL 10389, at *1–2, *7.

The Commission did not abuse its discretion in concluding that, based on the crane standard's text, structure, and history, Subsections 1926.1407(b)(3) and (d) unambiguously apply to all steps in a crane disassembly process, including preliminary steps that occur before any equipment is actually taken apart. *See TNT Crane*, 2020 WL 1657789, at *3–5. It therefore follows that the standard applied when TNT's crew attempted to lay the boom on a trailer to allow the boom to be physically dismantled. *See id.*

TNT argues, though, that the Commission abused its discretion in concluding that, even if the term "disassembly" is ambiguous, the Secretary's interpretation must be given deference because it is reasonable in light of the standard's purpose and regulatory history. *See id.* at *5–8. Because we conclude the term "disassembly" is not ambiguous, we need not reach this issue.

### b.    *Substantial evidence analysis*

TNT avers the Commission's determination that the citations applied to its work at the time of the incident is not supported by substantial evidence. TNT contends the ALJ correctly found that "[t]he facts presented at trial . . . clearly established that disassembly of the crane was *about* to begin, but had not actually started." According to TNT, disassembly would not begin until the actual removal of the first section of the jib, which had not yet occurred when contact was made with the power line. Rather, the accident occurred during preparatory actions — Benson was lowering the boom and retracting the hoist line. TNT also relies on the fact that when the accident occurred, none of the equipment necessary to disassemble the crane, including the helper crane, was in position. Additionally, TNT asserts the OSHA inspector lacked credibility and his investigation was conducted improperly, as he

had no personal knowledge of the crane industry and his inspection merely consisted of witness interviews.

The Commission determined that, when TNT's crew lowered the boom in an attempt to lay it on the trailer for dismantling, the action was part of the crane disassembly process. Certainly, lowering the boom onto the trailer was part of the plan for disassembling the boom, and the boom was lowered to position it for dismantling. Additionally, all four crew members gave statements to OSHA during the inspection indicating that the disassembly process had begun when the boom was lowered. Therefore, the Commission's determination that lowering the boom and retracting the hoist for the purpose of disassembly qualified as disassembly work under Section 1926.1407 is supported by substantial evidence.

Accordingly, the Commission did not abuse its discretion in applying the standard's plain meaning to TNT's work during the incident — a crew gathered to discuss the plan for disassembling the crane and executed the first step of the plan, attempting to lay the boom of the crane on a trailer to position the boom for dismantling.

## II.     *Element 4: TNT's knowledge of the violative conditions*

The employer is liable only if it knew, "or 'with the exercise of reasonable diligence, [should have known] of the presence of the violation.'" *W.G. Yates & Sons Constr. Co. v. OSHRC*, 459 F.3d 604, 607 (5th Cir. 2006) (quoting 29 U.S.C. § 666(k)). Because "[a] corporation can only act through its agents," "a corporation is usually liable for acts of its supervisors in the performance of their assigned duties" and is charged with "the supervisor's knowledge . . . of non-complying conduct of a subordinate." *Id.* (quotation marks and citations omitted). The *Yates* court created an exception to the general imputation rule, however: "[A] supervisor's knowledge of his own malfeasance is *not* imputable to the employer where the employer's safety

policy, training, and discipline are sufficient to make the supervisor's conduct in violation of the policy unforeseeable." *Id.* at 608–09 (emphasis in original).

In *Yates*, a supervisor's "own conduct," and not that of his subordinates, violated an OSHA standard. *Id.* at 607. We contrasted that situation — where the supervisor was "himself the malfeasant [and] personally act[ed] contrary to instructions" — to the "ordinary context" where a subordinate violates a standard and "the supervisor's knowledge of [the] employee's unsafe conduct is imputable to his 'master', the employer." *Id.* at 609 n.7. In the former situation, we reasoned it would unfairly relieve the Secretary of his burden to prove employer knowledge if a supervisor's knowledge of his own misconduct was automatically imputed to the employer. *Id.* at 607–09.

We confirmed this distinction in *Angel Bros.*, 18 F.4th at 830–32. That case concerned a situation similar to the one here, where a supervisor had actual knowledge of a subordinate employee's working in an unguarded trench, which violated an OSHA standard. *Id.* at 829. The court found the *Yates* exception was inapplicable because the supervisor's actions did not constitute the cited violation; rather, "the safety violation was the presence of [the subordinate] . . . in the unsafe trench." *Id.* at 832. The court reasoned that any claim "that a supervisor's knowledge cannot be imputed to the employer when the supervisor authorizes, or takes some other active role in, a subordinate's safety violation" has "no support in *Yates*, in agency principles, or in other caselaw." *Id.*

The parties dispute whether the *Yates* foreseeability exception applies here. TNT maintains the ALJ correctly determined on remand that the exception applies and that, consequently, the Secretary failed to prove TNT had knowledge of the violative conditions. Furthermore, TNT argues *Angel*

*Bros.* is distinguishable and *Yates* is more analogous because, here, Benson engaged in the violation.  We disagree.

The Commission correctly determined the *Yates* exception does not apply, because all the TNT crew members were engaged in the violative conduct under each citation item, and, accordingly, Benson's knowledge of his crew's misconduct was automatically imputed to TNT.  *See TNT Crane*, 2022 WL 2102910, at *3–4.  Contrary to TNT's assertion that only Benson committed the violations, substantial evidence supports the Commission's finding that all four TNT employees collectively worked to disassemble the crane without a measure in place to prevent encroachment on the energized power line and when the hoist line was closer than 10 feet from the power line. *See id.* at *3.

In addition, even though the supervisor in *Angel Bros.* did not engage in the violation alongside his subordinate, both in *Angel Bros.* and here, a subordinate employee engaged in conduct that violated the standard(s), a supervisor had knowledge of the subordinate's conduct, and that knowledge is imputed to the employer under "[o]rdinary imputation principles."  *See Angel Bros.*, 18 F.4th at 832.  Consequently, the Commission did not abuse its discretion in finding that the *Yates* foreseeability exception did not apply here and that Benson's knowledge of his subordinates' conduct violating Subsections 1926.1407(b)(3) and (3) established TNT's knowledge of the violations.

###### III.    *Affirmative defense of unpreventable employee misconduct*

TNT can avoid liability if it shows "that the violation resulted from unpreventable employee misconduct."  *See id.*  TNT must prove, for each violation, that it: "1) ha[d] established work rules designed to prevent the violation, 2) ha[d] adequately communicated these rules to its employees, 3) ha[d] taken steps to discover violations, and 4) ha[d] effectively enforced the rules when violations [were] discovered."  *See id.* at 832 (quoting *Yates*, 459

F.3d at 609 n.7). TNT's burden is high because employers have a "heightened duty to ensure the proper conduct of [supervisory] personnel," and Benson's participation in the violative conduct "is strong evidence that implementation of the [safety] policy was lax." *See Floyd S. Pike Elec. Contractor, Inc. v. OSHRC*, 576 F.2d 72, 77 (5th Cir. 1978) (quotation marks and citation omitted).

First, substantial evidence supports the Commission's determination that TNT did not have a work rule designed to prevent violations of Section 1926.1407(b)(3).[5] *See TNT Crane*, 2022 WL 2102910, at *5. "[A] work rule is an employer directive that requires or prescribes certain conduct" and, to be adequate, must "specifically match the violation at issue." *Southern Hens, Inc. v. OSHRC*, 930 F.3d 667, 678 (5th Cir. 2019) (quotation marks and citation omitted). TNT points to section 13 of its Safety Operating Procedures, which contains rules addressing "Electrical Hazards and Warnings (1926.1411)."[6] As the Commission stated, section 13 does not address

---

[5] The Commission found TNT's work rules addressed the requirements of Section 1926.1407(d) and that TNT adequately communicated these rules to its employees. *TNT Crane*, 2022 WL 2102910, at *5–6. The parties do not contest these findings.

[6] Section 13 of TNT's safety policy states:

For lines rated 50kV or below, minimum clearance between the lines and any part of the crane or load shall be 10 feet. During the pre-job meeting any power lines that are located in the work area will be identified and discussed. If it is determined that any part of the equipment, load line or load could get closer than 20 feet to a power line then at least one of the following measures must be taken: 1) Ensure the power lines have been de-energized and visibly grounded, 2) Ensure no part of the equipment, load line or load gets closer than 20 feet to the power line, or 3) Determine the line's voltage and minimum approach distance permitted.

When moving cranes around electrical equipment a spotter must be in place to assist Operator or have a back up alarm that is audible above the surrounding noise level.

Section 1926.1407(b)(3)'s express mandate that an employer implement at least one of the five listed measures to prevent encroachment on an energized power line during a disassembly process. *TNT Crane*, 2022 WL 2102910, at *5. The only measure section 13 mentions — designating a spotter — is insufficient, as it does not clearly establish "when a spotter is 'necessary' or otherwise required." *See id.*

Second, substantial evidence supports the Commission's determination that TNT did not adequately monitor employee compliance with its power line safety rules. *See id.* at *5–7. The Commission reasoned TNT did not provide "sufficient evidence" regarding the frequency of its audits to find them sufficient for monitoring employee compliance with safety rules. *Id.* at *7. For instance, while TNT proffered evidence that audits occurred, TNT management could not identify *how often* audits occurred. Moreover, TNT did not provide evidence that it used the audit program to monitor compliance with its power line safety rules at remote worksites like the Georgetown worksite.[7] *See id.*

Finally, substantial evidence supports the Commission's determination that TNT did not prove it effectively enforced its power line safety rules when it discovered violations. *See id.* at *8. TNT claims it disciplines employees pursuant to its disciplinary policy. Undermining that assertion, though, TNT provided no evidence "that it ever previously disciplined an employee for violating its power line safety rules." *Id.* Considering TNT is

---

> If necessary a spotter will be designated to monitor the approach distance and alert Operator if that distance becomes compromised.

[7] The Commission has previously found monitoring insufficient where no evidence showed that the employer monitored employee compliance with the rules pertaining to the specific conduct at issue in the citation during site visits. *Sec'y of Lab. v. Sw. Bell Tel. Co.*, 19 OSHC (BNA) 1097, 2000 WL 1424806, at *3 (No. 98-1748, 2000), *aff'd*, *Sw. Bell Tel. Co. v. Chao*, 277 F.3d 1374 (5th Cir. 2001).

a large employer, the Commission found it unreasonable to assume that no violations of power line safety rules ever occurred prior to the cited violations. *Id.* Indeed, in *Angel Bros.*, we determined that effective enforcement was not established where a large employer performed many excavations but had "only documented two instances of disciplining employees for rules violations," both of which "came after OSHA inspectors uncovered the violations." 18 F.4th at 833. Additionally, as the Commission here identified, Benson's participation in the violative conduct is strong evidence that TNT's enforcement of power line safety rules was lax. *See TNT Crane*, 2022 WL 2102910, at *8 (citing cases, *e.g., Floyd*, 576 F.2d at 77).

We uphold the Commission's determination that TNT failed to establish the defense. The petition for review is DENIED.